**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| MIDWAY INSURANCE MANAGEMENT INTERNATIONAL, INC., | § § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | CIVIL ACTION FILE No. 1:20-cv-1481-SEG |
| ACCIDENT INSURANCE COMPANY, INC and TIMOTHY EDINGTON | § § § § | |
| *Defendants.* | § § § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ACCIDENT INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Midway Insurance Management International, Inc. ("Midway") with its Response in Opposition to Defendant Accident Insurance Company's ("Accident") Motion for Summary Judgment.

## I.    INTRODUCTION

First, Accident's Motion for Summary Judgment should be styled as a Partial Motion for Summary Judgment, as there are claims not addressed, including quantum meruit, unjust enrichment, and attorney's fees. Midway sued for breach of contract and breach of the implied covenant of good faith

and fair dealing. In the alternative, should a factfinder determine that a contract did not exist, Midway brought claims for promissory estoppel, quantum meruit, and unjust enrichment. Midway also asserts a claim for attorney's fees.[1]

Second, there are numerous questions of material fact that should be left to a jury. Accident's argument relies solely on the fact that there was no signed agreement. This does not end the inquiry, nor is it dispositive of the issue. It is well-settled under Georgia law that mutual assent to the terms of a contract can be shown by the acts or omissions of a party, including a course of dealing. As will be shown, Defendant's arguments are without merit.

The contract that existed between the parties was breached. There are disputed material facts that support this view. Based on the facts and legal arguments, a reasonable jury could conclude that a contract existed and it was breached by Accident.

Alternatively, if a jury were to conclude that a contract did not exist, they may conclude that Accident was estopped from denying Midway payment for services rendered. A reasonable jury could conclude that Accident, made promises through a course of dealing that was evidenced by emails, payments,

---

[1] Plaintiff has notified Defendants that it will abandon its claims for fraudulent misrepresentation and punitive damages against Accident and Edington. This will result in Edington's dismissal from the case. Plaintiff will file a formal pleading dismissing the claims shortly.

and discussions of services, which induced Midway to perform services. Under this theory, a reasonable jury could award damages under the equitable doctrine of promissory estoppel.

## II.    FACTS

Midway is a third-party administrator ("TPA") of claims. [Pl.'s Add. Stmt. of Facts ¶ 1]. A TPA administers claims on behalf of companies that have assumed the risk for the insurance policies. A TPA's fees and expenses are paid by the company(s) for whom the claims are administered on behalf of. [Exhibit 1, Washburn Decl. ¶ 3]. Accident Insurance Co., Inc., is an insurance company. [Pl.'s Add. Stmt. of Facts ¶ 2]. Citadel is a reinsurance company. [*Id.* ¶ 3]. At all relevant times, Jeff Washburn was the owner of Midway; Art Coleman was the president of Citadel's US Operations; Michael Hunter was Accident's Chief Financial Officer; and Robbie Robinson was Accident's Director of Financial Reporting and Compliance. [*Id.* ¶¶ 3, 6; Exhibit 1, Washburn Decl. ¶ 1].

At the outset of the arrangement between the parties for the relevant program, the NAFTA trucking program, there were two related but separate contracts: one between Accident and Citadel regarding issuing of policies, and another between Citadel and Midway for TPA services. [Pl.'s Add. Stmt. of

Facts ¶ 4]. Under the terms of the initial contracts, Citadel was responsible for 100% of the risk and Midway's TPA fees and expenses. [*Id.* ¶ 5].

In late 2014 and early 2015, Accident and Citadel negotiated a pro-rata split of the risk and of Midway's fees and expenses. [*Id.* ¶ 6]. The terms of the negotiations were set forth in an email from Art Coleman ("the Art Coleman Email") dated January 5, 2015, with the subject "Contractual relationship between AIC Citadel and Midway." [*Id.* ¶¶ 6-7]. The terms were these:

(1) For Policies written between August 1, 2012 and December 31, 2013 Citadel assumes 100% of AIC's liability. Citadel pays 100% of Midway's Fees and Expenses out of Premiums due and owing from AIC.

(2) For Policies written between January 1, 2014 and May 22, 2014 Citadel and AIC share in the risk on a proportional basis predicated on Citadel's agreement to take a 100% Quota Share of $5M of Gross Premium Written. I suggest that we use the following split and then true it up at the end (Citadel will pay 42.25% of Midway's Fees and Expenses and AIC will pay 57.75% of Midways Fees and Expenses. To date, Citadel funds have been used to pay Midway's Fees and Expenses and Citadel and AIC will true that up between ourselves.

(3) For policies written after May 22, 2014 Citadel has no liability and Accident has 100% liability for Midway's Fees and Expenses. To the extent that Midway has been paid for Fees and Expenses for claims emanating from policies written during this period Citadel and AIC will true that up between ourselves. There will need to be a new contract between AIC and Midway for claims emanating from policies written after May 22, 2014.

[*Id.* ¶ 7].[2] The Art Coleman Email contained a proposed endorsement for Accident and Midway that was never executed. [*Id.* ¶ 8]. Similarly, a signed agreement was never executed by Accident and Citadel for the new terms. [*Id.* ¶ 10]. Just like Accident and Midway, Accident and Citadel relied on a course of dealing, statements, and emails, to outline the contours of their contract. [*Id.*]. There is nothing out of place. It is customary for sophisticated business entities, such as those in the insurance industry, to rely on a course of dealing for contract formation, rather than a signed instrument. [*Id.* ¶ 20].

Accident was unable to testify as to the matters negotiated between its former CFO Michael Hunter and Citadel's Art Coleman. [*Id.* ¶ 9]. Art Coleman, however, clearly believed the terms of the negotiation included Accident paying a pro-rata split of Midway's fees and expenses, and 100% of the fees and expenses that Accident was fully responsible for. [*Id.* ¶¶ 9, 14-16]. This is evidenced, not only by the Art Coleman email, but through other emails to and from Accident and Citadel, and conversations that Jeff Washburn had with Michael Hunter. [*Id.*; Ex. 1, Washburn Decl. ¶ 7].

For the better part of a year, all three parties complied with the terms of the Art Coleman Email. This is illustrated by several emails sent by Art

---

[2] A *de minimis* change was later made to the ratios of the pro-rata split between Accident and Citadel, with Accident's split changing from 57.75% to 57.88%, and Citadel's change from 42.25% to 42.12%, respectively. [Pl.'s Add. Stmt. of Facts ¶ 13].

Coleman to Accident and Midway, setting forth the amounts owed under the pro-rata split. [Pl.'s Add. Stmt. of Facts ¶¶ 14, 15, 17]. Perhaps most convincing is the email sent by Accident's Robbie Robinson, discussing the $1,535,296.00 in wire transfers Accident sent to Midway, specifically for "claims activity and [Midway's] expenses." [*Id.* ¶ 16]. This fact is bolstered by Midway's bank statements that show wire payments from Accident in the precise amounts stated in the Robinson email. [*Id.*]. Based upon Robinson's email, there is no question that Accident believed it was responsible for the pro-rata share of Midway's fees and expenses.

Accident admits that it never repudiated the agreement or requested that Midway cease providing TPA services until "much after the fact." [*Id.* ¶ 18]. Further, Accident concedes that Midway did provide its valuable TPA services for claims under the pro-rata split and the period for which Accident assumed 100% responsibility. [*Id.* ¶ 19].

### III.   ARGUMENT AND CITATION TO AUTHORITY

Based on the disputed material facts in this case, a reasonable jury could conclude that Accident assented to the material terms of the agreement through a course of dealing which manifested that assent. Such a conclusion would support the conclusion that a valid contract existed between Midway

and Accident. A reasonable jury could therefore conclude that Accident is liable for breach of contract.

Even if a jury were to decide that a contract did not exist, a reasonable jury could find that Accident's manifestations of intent acted as a promise that induced Midway to provide its services.[3] Thus, Defendant's Motion should be denied.

A. **A Reasonable Jury Could Conclude From the Disputed Material Facts that a Contract Existed Between Midway and Accident and the Contract Was Breached.[4]**

Under Georgia law, the formation of a valid contract is relatively simple. There must be:

- parties able to contract,
- a consideration moving to the contract,
- the assent of the parties to the terms of the contract, and
- a subject matter upon which the contract can operate.

O.C.G.A. § 13-3-1.

A reasonable jury could find that each of these elements is met and that a contract existed. Since the subject matter and the terms of the agreement were set forth in the email, the only element at issue in Defendant's Motion for

---

[3] Since Defendant's Motion does not argue for dismissal of the quantum meruit or unjust enrichment claims, they will not be addressed.

[4] If a factfinder determines the disputed facts support a finding of contract formation in this case, then the Implied Covenant of Good-Faith and Fair Dealing is at issue. Thus, this brief will address the breach of contract claim since the covenant is implied where a contract exists.

Summary Judgment is whether there was mutual assent to the contract's terms. A reasonable jury could answer "yes."

> To determine whether the parties mutually assented to all essential terms of the contract, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

*Bedsole v. Action Outdoor Adver.*, 325 Ga.App. 194, 198 (2013). And although the pro-rata split between Citadel and Accident set forth in the Art Coleman Email were had a *de minimis* difference from the percentages ultimately paid, the "law does not favor destroying contracts on the basis of uncertainty, and a contract that may originally have been indefinite may later acquire more precision and become enforceable because of the subsequent words or <u>actions of the parties</u>." *Id.* at 198-199 (emphasis supplied).

Defendant relies heavily on the testimony of Jeff Washburn for the proposition that there was not a contractual agreement. This testimony, however, is taken out of context and belies the argument that Jeff Washburn and Midway have made throughout the litigation. The testimony cited contains questions and answers dealing with a physical written contract. As is evident from the context of the testimony, the questions were addressed to the proposed endorsement that was attached to the Art Coleman Email. Mr.

Washburn was answering questions about whether a written contract was executed. Mr. Washburn goes on to testify about the course of dealing that exhibited mutual assent to the terms set forth in the Art Coleman Email. [See e.g., Washburn Dep. 64:13-22]. Defendant attempts to take the testimony about a written contract out of context. Jeff Washburn is not an attorney and merely testified about whether a signed instrument existed. This naked attempt to ask the Court to misconstrue the evidence is not well taken.

In truth, as Defendant knows, the terms of the Art Coleman Email were complied with by all three parties for the better part of a year under the MAC-1 Split[5]: Citadel and Accident both paid Midway's fees and expenses in the pro-rata split as set forth in the Art Coleman Email. [Pl.'s Add. Stmt. of Facts ¶¶ 14-17]. A reasonable jury could look at this course of dealing between the parties and determine that all three parties operating precisely as set forth in the Art Coleman Email is evidence of mutual assent. This is reinforced by the fact that Citadel and Accident never signed a new contract either; instead, the entirety of the new contract was based upon oral agreements, the terms set forth in the Art Coleman Email, and the course of dealing. [*Id.* ¶ 10]. Georgia courts have consistently held that where there is evidence in dispute

---

[5] The MAC-1 Split program was Midway's internal reference for the claims that fell under the pro-rata split between Accident and Citadel; the claims for which Accident was 100% responsible was referred to internally as the MAC-2 program. [Pl.'s Add. Stmt. of Facts ¶¶ 11-12].

concerning the formation of a contract, it is a question for a jury. *See e.g., Bedsole v. Action Outdoor Adver., supra*; *Terry Hunt Constr., Inc. v. AON Risk Servs.*, 272 Ga.App. 547 (2005).

For example, in *Bedsole*, the terms of an agreement were negotiated between four parties, including the plaintiff, Bedsole.[6] 325 Ga.App. at 194-195. A one-page "Letter of Agreement" was drawn up for the parties' signatures that set forth the terms of the agreement. *Id.* at 195. The Letter of Agreement was never signed. *Id.* Following this, the parties complied with the terms as set forth in the Letter of Agreement, paying Bedsole the amounts agreed to in the document. *Id.* at 195-196. Later, the company decided that it would no longer pay Bedsole as contemplated in the Letter of Agreement. *Id.* at 196. The company argues that the unsigned Letter of Agreement was a "proposed agreement" to be used "as a guideline, which it followed… not exactly but closely." *Id.* The company argued that the minor differences between the Letter of Agreement and payment to Bedsole, and the fact that the Letter of Agreement was unsigned, meant there was no contract. *Id.* Bedsole argued that payments to him were "calculated based upon the formula in the Letter of Agreement." *Id.*

---

[6] Three of those parties comprised 1/3 each of an advertising company.

The *Bedsole* court held that, based upon the evidence of "the parties' understanding of their agreement," the parties' actions after the Letter of Agreement was not signed, and documents detailing the computation of payments that were made in accordance with the Letter of Agreement, showed a genuine factual issue as to whether a contract existed. *Id.* at 199. Thus, the trial court's grant of summary judgment was reversed. *Id.*

*Bedsole* is instructive as it shares factual similarities to this case. For example, the Art Coleman Email set forth the material terms of the agreement and all three parties' obligations. [Pl.'s Add. Stmt. of Facts ¶¶ 6-7]. As in *Bedsole*, the agreement was never signed. [*Id.* ¶ 8]. And like the Letter of Agreement in *Bedsole*, the parties acted in accordance with the terms set forth in the Art Coleman Email, by making payments congruent with the pro-rata split, despite the proposed contract remaining unsigned. [*Id.* ¶¶ 14-17]. Accident's assent through action is evidenced in the Robbie Robinson Email of September 30th, where he outlines the pro-rata payments that were made to Midway under the terms set forth in the Art Coleman Email in the amount of $1,535,296.00. [*Id.* ¶ 16]. According to Robinson, these payments to Midway under the pro-rata split were specifically made for "claims activity and [Midway's] expenses." [*Id.*].

Other evidence that creates a question of fact is (1) the June 12, 2015 email from Citadel's President Art Coleman setting forth the pro-rata share

of Midway's fees and expenses that were owed by Accident; and (2) Midway's Bank Records showing Accident wire transfers amounting to $1,535,296.00. [*Id.*]. Much like the documentation that raised a question of fact in *Bedsole*, a reasonable jury could determine this documentation, along with the course of dealing and payments, support the elements of an enforceable contract. Further, Accident was aware that Midway was operating under the terms of the Art Coleman Email and never told Midway to cease providing services. [*Id.* ¶ 18].

The "courts apply an objective theory of intent, whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to the manifestations of assent." *Doss & Assoc. v. First Am. Title Ins. Co.*, 325 Ga.App. 448, 451 (2013). A reasonable jury, applying this objective theory, could find that the parties' course of dealing, the Art Coleman Email, the emails to and from Accident acknowledging the pro-rata split of Midway's fees and expenses, and Accident's payments to Midway in the precise amounts of the pro-rata split, was a manifestation of assent.

Accident's 30(b)(6) deponent testified that Accident was presently unaware of what agreements the former Chief Financial Officer, Michael Hunter, had entered on Accident's behalf. [Pl.'s Add. Stmt. of Facts ¶ 9].

Accident testified that no payments were made to Midway for fees and expenses under the pro-rata split or for claims handled by Midway where Accident assumed 100% of the risk. [*Id.* 22:16-20]. When Accident's deponent was shown proof that Accident paid Midway's fees and expenses for claims falling under the pro-rata split and 100% risk, the only response was that it must have been a mistake. [*Id.*]. But, as discussed above, the emails from Accident tell a different story.

According the Robinson email, Accident's CFO was aware that it had made pro-rata and 100% risk payments to Midway for fees and expenses. Had it been a mistake or an oversight, why then did Accident not direct Midway to cease providing TPA services? [Pl.'s Add. Stmt. of Facts ¶ 18]. At the same time, Midway was unable to cease providing TPA services lest it find itself liable for its own breach of contract. As Midway testified, there was a legal duty under the contract to continue to provide services. [*Id.* ¶ 20]. A reasonable jury could determine that the disputed facts weigh towards finding the existence of a valid contract. Defendant's Motion should be denied.

B. **Even if a Jury Determined a Contract Did Not Exist, They Could Determine that it was Reasonable for Midway to Rely on Accident's Actions as a Promise to Comply with the Written Terms and That Justice Demands Enforcement of that Promise.**

> The elements of the equitable doctrine of promissory estoppel are that the defendant made a promise upon which he reasonably should have expected the plaintiff

> to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right.

*Bedsole*, 325 Ga.App. at 199.

> [E]ven if the contract in this case could be considered too indefinite to enforce, a party may enter into a contract invalid and unenforceable, and by reason of the covenants therein contained and promises made in connection with the same, wrongfully cause the opposite party to forego a valuable legal right to his detriment, and in this manner by his conduct waive the right to repudiate the contract and become estopped to deny the opposite party any benefits that may accrue to him under the terms of the agreement.

*Id.*

*Bedsole* is useful in this context as well. The court held that since, for a period, the defendant "acted as if the [unsigned] letter of agreement" was in effect, it was reasonable for Bedsole to expect that the defendant would continue to comply with the terms set forth in the unsigned letter of agreement. *Id.* at 199-200. Here too, the evidence clearly shows that after the Art Coleman Email was sent to all parties involved, Accident comported with the terms. [Pl.'s Add. Stmt. of Facts ¶¶ 14-17]. This promise is illustrated by the Robbie Robinson Email that set forth the basis for payments of over one-and-a-half million dollars, which expressly included Midway's fees and expenses. [*Id.* ¶¶ 15-16]. This is further supported by the Citadel Email breaking down Accident's pro-rata split of Midway's fees and expenses, which

Accident <u>never</u> repudiated and according to which payments were made to Midway. [*Id.* ¶ 18].  Just as in *Bedsole*, a reasonable jury could find that Accident's course of dealing was evidence of a promise that Midway relied on to its detriment.

Although there was a *de minimis* difference between the pro-rata split in the Art Coleman Email and the split that was ultimately negotiated, this minor difference does not vitiate the promise. "The objection of indefiniteness may be obviated by performance and acceptance of performance." *Bedsole* at 199.

There are myriad facts in dispute in this case that are properly decided by a reasonable jury. Defendant's [Partial] Motion for Summary Judgment should be denied and the fact questions left to a jury.

## IV.   CONCLUSION

Based on the questions of fact and the legal authority cited, a reasonable jury could conclude that Accident is liable for breach of contract or, in the alternative, under the equitable doctrine of promissory estoppel. Defendant's Motion for Summary Judgment should be denied.

This 11th day of July, 2022.

HENEFELD & GREEN, P.C.

/s/ Noah Green
Noah Green
Georgia Bar No. 468138
*Attorney for Plaintiff*

3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
(404) 841-1275
ngreen@henefeldgreen.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 13-point Century Schoolbook type face.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| MIDWAY INSURANCE MANAGEMENT INTERNATIONAL, INC., | § § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | CIVIL ACTION FILE No. 1:20-cv-1481-SEG |
| ACCIDENT INSURANCE COMPANY, INC and TIMOTHY EDINGTON | § § § § | |
| *Defendants.* | § § § | |

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served counsel for the opposing parties with a copy of **RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**, by filing same with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

This 11th day of July, 2022.

HENEFELD & GREEN, P.C.
/s/ Noah Green
Noah Green
Georgia Bar No. 468138
*Attorney for Plaintiff*

3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
(404) 841-1275
ngreen@henefeldgreen.com